IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| HIGH 5 SPORTSWEAR, INC., | : | Case No. 3:15-cv-00401 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| H5G, LLC., | : | |
| Defendant/Third-Party Plaintiff, | : | |
| v. | : | |
| SELECTIVE INSURANCE COMPANY OF AMERICA, | : | |
| Third-Party Defendant. | : | |

___

**ENTRY AND ORDER GRANTING THIRD-PARTY DEFENDANT SELECTIVE INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT (DOC. 46)**
___

This case is before the Court on the Motion for Summary Judgment (Doc. 46) filed by Third-Party Defendant Selective Insurance Company of America ("Selective"). In the First Amended Third-Party Complaint, Defendant and Third-Party Plaintiff H5G, LLC ("H5G") alleges that Selective owes a duty to defend and indemnify H5G against High Five Sportswear, Inc.'s claims in this lawsuit. H5G filed an opposition to Selective's Motion for Summary Judgment, in response to which Selective filed a reply. (Docs. 47–48.) The Motion is now fully briefed and ripe for review. As Selective has established that there is no genuine issue of material fact and it is entitled to summary judgment on all of H5G's claims as a matter of law, the Court **GRANTS** the Motion for Summary Judgment and **DISMISSES** H5G's First Amended Third-Party Complaint.[1]

___

[1] The Court acknowledges the valuable contribution of judicial extern Jonathan M. Zalewski in drafting this opinion.

1

**I.      BACKGROUND**

This case arises out of a complaint for trademark infringement and cybersquatting (hereinafter, the "*High Five* Lawsuit") filed by Plaintiff High 5 Sportswear, Inc. ("High Five") against Defendant H5G. (Doc. 1.)  As a result of that suit, H5G submitted a claim under its commercial insurance policy with Selective (hereinafter, the "Insurance Policy"). Selective denied the claim, and on February 26, 2016, H5G filed a third-party complaint against Selective.  (Doc. 19.)

H5G seeks declaratory judgments that Selective has, under the Insurance Policy, a duty to defend and indemnify H5G in the *High Five* Lawsuit. (*Id.* at 7.) H5G further seeks damages for breach of contract and the alleged bad faith denial of H5G's insurance claim. (*Id.* at 8–9.) Selective filed an Answer (Doc. 22) to H5G's First Amended Third-Party Complaint on March 14, 2016, and filed the Motion for Summary Judgment (Doc. 46) on September 19, 2016.

**A.   The Insurance Policy**

The following facts are undisputed by the parties. On June 2, 2015, Selective issued the Insurance Policy to H5G for a policy term from June 4, 2015, to June 4, 2016. (Doc. 46-3, at 179.) The Insurance Policy was the first policy issued by Selective to H5G. (Doc. 46 at 4; Doc. 47 at 1.) The Insurance Policy provides coverage for commercial general liabilities, including coverage for "personal and advertising injury liability." (Doc. 46-3, at 122.) The Insurance Policy contains the following coverage provisions:

> **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**
>
> **1.   Insuring Agreement**
>
> > a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.
>
> . . .
>
> > b.  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

(*Id.*)

The Insurance Policy defines "advertisement" and "personal and advertising injury" as follows:

> **SECTION V — DEFINITIONS**
>
> 1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
>
>     a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and
>     b. Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

(*Id.* at 129.)

> . . .
>
> 14. "Personal and advertising injury" means injury, including consequential "bodily injury" arising out of one or more of the following offenses:
>
>     a. False arrest, detention or imprisonment;
>     b. Malicious prosecution;
>     c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>     d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or service;
>     e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
>     f. The use of another's advertising idea in your "advertisement"; or
>     g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."
>
> . . . .

(*Id.* at 131.)

The Insurance Policy's coverage for personal and advertising injury is, however, subject to certain exclusions. Of relevance to Selective's Motion for Summary Judgment, the Insurance Policy contains the following coverage exclusions:

3

    **2. Exclusions**

This insurance does not apply to:

    **a. Knowing Violation of Rights of Another**
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

. . .

    **c. Material Published Prior To Policy Period**
"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

. . .

    **i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**
"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

. . .

    **l. Unauthorized Use Of Another's Name Or Product**
"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

. . . .

(*Id.* at 122–23.)

    **B. The *High Five* Lawsuit**

On or about May 1, 2015, High Five requested H5G to "cease and desist from any further use of 'High Five,' 'High 5,' or the handprint in association with [H5G]'s business." (Doc 1, at 9; Doc 8, at 12.) High Five ultimately proposed a settlement agreement to H5G, but H5G rejected the settlement offer on or about August 20 and August 27, 2015. (Doc. 1, at 9–10; Doc. 8, at 14–15.) On November 6, 2015, High Five filed this lawsuit against H5G in this Court. (Doc. 1.)

High Five asserts six causes of action against H5G premised on the alleged infringement of High Five's federally registered and common law trademarks (collectively the "High Five Marks"). (*Id.* at 10–16.) First, High Five alleges H5G infringed on the High Five Marks in violation of Section 32 of the Lanham Act. (*Id.*) Second, High Five alleges H5G infringed on High Five's common law rights in the High Five Marks. (*Id.*) Third, High Five alleges H5G adopted marks that are likely to be confused with the High Five Marks in violation of Section 43(a) of the Lanham Act for false designation of origin. (*Id.*) Fourth, High Five alleges H5G engaged in the bad faith use of the High Five Marks "by registering and using the high5gear.com domain name" in violation of 15 U.S.C. § 1125(d) for cybersquatting. (*Id.*) Fifth, High Five alleges H5G used marks that are likely to be confused with the High Five Marks in violation of Ohio Rev. Code § 4165 for deceptive trade practices. (*Id.*) Sixth, and lastly, High Five alleges H5G engaged in unfair competition and misappropriated High Five's name, reputation, and goodwill in violation of Ohio common law for unfair competition. (*Id.*)

### C. H5G's Insurance Claim to Selective

On November 18, 2015, H5G submitted a claim to Selective under the "personal and advertising injury liability" provision of the Insurance Policy. (Doc. 19-4.) In its claim letter, H5G demanded that Selective defend H5G in the *High Five* Lawsuit because "the Complaint most explicitly alleged personal and advertising injury as stated in the Policy." (*Id.*) On December 28, 2015, Selective denied coverage on the basis that High Five alleged trademark infringement and cybersquatting claims that are not covered under the Insurance Policy. (Doc. 19, at 5; Doc. 19-5, at 2.)

### D. H5G'S Third-Party Complaint Against Selective

On February 26, 2016, H5G filed the First Amended Third-Party Complaint, which asserts four claims against Selective. (Doc. 19.) First, H5G seeks a declaratory judgment that Selective has a duty to defend H5G in the *High Five* Lawsuit against "third-party claims or suits for damages arising out of alleged personal and advertising injuries." (*Id.* at 7.) Second, H5G seeks a declaratory judgment that Selective has a duty to indemnify H5G for damages from claims in the *High Five* Lawsuit arising out of alleged personal and advertising injuries. (*Id.*) Third, H5G seeks damages for Selective's alleged breach

of the Insurance Policy. (*Id.* at 8.) Fourth, H5G alleges Selective had no reasonable basis for denying H5G's insurance claim, and, therefore, Selective should be held liable for bad faith denial of coverage. (*Id.* at 8–9.) On March 14, 2016, Selective filed an Answer to H5G's First Amended Third-Party Complaint denying the allegations of the four claims alleged by H5G. (Doc. 22, at 6–7.).

### E. Selective's Motion for Summary Judgment

In support of its Motion for Summary Judgment, Selective first argues that the *High Five* Lawsuit did not trigger its duty to defend because the Complaint's allegations fall outside the Insurance Policy's coverage terms. (Doc. 46-1, at 24.) Specifically, Selective asserts that High Five's claims are premised on trademark infringement and cybersquatting, which are not covered by the "personal and advertising injury" provisions. (*Id.* at 1– 2.) In the alternative, Selective argues, even if High Five's allegations fall within the "personal and advertising injury" provisions, coverage is precluded by the following four policy exclusions: (1) Knowing Violation Of Rights of Another, (2) Material Published Prior to Policy Period, (3) Infringement of Copyright, Patent, Trademark or Trade Secret ("Intellectual Property Exclusion"), and (4) Unauthorized Use of Another's Name or Product. (*Id.* at 15–22.) Selective argues that it has no duty to indemnify H5G under the Insurance Policy for the same reasons that it has no duty to defend—namely, the Insurance Policy does not provide coverage for H5G's claims. (*Id.* at 22.) Finally, Selective argues that, as a matter of law, H5G's bad faith claim must fail because Selective has no duty to defend or indemnify H5G. (*Id.* at 23.)

In response, H5G argues that the Complaint's allegations describe a claim for infringement of High Five's trade dress or slogan, and therefore come within the "personal and advertising injury" provisions. (*Id.* at 10-12.) H5G also argues that the Insurance Policy's exclusions do not apply. (*Id.* at 15.) H5G also argues that the Court need not consider whether Selective has a duty to indemnify because that claim will not be triggered unless H5G is found liable for damages. (*Id.* at 24.) Lastly, H5G argues that entering summary judgment on H5G's bad faith claim would be improper because the parties have not completed any discovery. (*Id.* at 25.) H5G asserts that it requires discovery to demonstrate Selective's bad faith in denying coverage. (*Id.*)

**II.     ANALYSIS**

    A.  **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (2000)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324. In reviewing this evidence, Summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." *White's Landing Fisheries, Inc. v. Buchholzer,* 29 F.3d 229, 231–32 (6th Cir.1994) (citations omitted). The non-movant is, however, obligated to notify the court of its need for discovery. *Id.* "Thus, before a summary judgment motion is decided, the nonmovant must file an affidavit pursuant to Fed. R. Civ. P. 56(f) which details the discovery needed, or file a motion for additional discovery." *Id.*

7

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.* However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted to the court. Fed R. Civ. P. 56(c).

## B. Duty to Defend

An insurance policy is a contract. *See Smith v. Katz*, 226 Wis. 2d 798, 806 (Wis. 1999).[2] Courts therefore apply well-established contract principles to interpret an insurance policy's provisions. *Id.* Unambiguous language in an insurance policy is interpreted according to its plain meaning. *Acuity v. Bagadia*, 310 Wis. 2d 197, 208 (Wis. 2008). Plain meaning interpretation restricts courts from rewriting unambiguous provisions that in effect "bind an insurer to a risk which the insurer did not contemplate and for which it has not been paid." *Qualman v. Bruckmoser*, 163 Wis. 2d 361, 365 (Wis. Ct. App. 1991) (citing *Wisconsin Builders, Inc. v. General Ins. Co. of Am.,* 65 Wis.2d 91, 103 (Wis.1974)). If a policy's language is ambiguous, it must be construed in favor of the insured. *Liebovich v. Minnesota Ins.*

---

[2] Selective and H5G agree the Insurance Policy is to be interpreted under Wisconsin law because the policy was issued in the State of Wisconsin. (Doc. 46-1, at 9 n.1; Doc. 47, at 7 n.1.)

*Co.*, 310 Wis. 2d 751, 766 (Wis. 2008). "A word or phrase in an insurance contract is ambiguous if it is susceptible to more than one reasonable construction." *Atl. Mut. Ins. Co.* v. *Badger Med. Supply Co.*, 191 Wis. 2d 229, 237 (Wis. Ct. App. 1995). The construction of an insurance policy is a question of law. *Phillips v. Parmelee*, 351 Wis. 2d 758, 763 (Wis. 2013).

Wisconsin courts apply a three-part analysis to determine if an insurer has a duty to defend an insured. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis. 2d 16, 32–33 (Wis. 2004). First, the court must determine whether the insurer's duty to defend is triggered by an initial grant of coverage. *Id.* To make this determination, the court focuses exclusively on the allegations within the "four corners of the complaint, without resort to extrinsic facts or evidence." *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 261 Wis. 2d 4, 18 (Wis. 2003). The court compares the allegations with the terms and conditions of the insurance policy. (*Id.*) If an "insurance policy provides coverage for even one claim made in a lawsuit, the insurer is obligated to defend the entire suit." *Badger Med. Supply Co.*, 191 Wis. 2d at 242. If, however, the complaint does not allege any claim within the coverage provided, the insurer has no duty to defend. *Id*. Second, if the insurance policy does not cover the nature of the alleged claims, the court's analysis ends. *Am. Family Mut. Ins. Co.*, 268 Wis. 2d at 33. Third, and finally, if the claims do trigger the insurer's duty to defend, the court examines the policy's exclusions to determine if any of them preclude coverage for the insured. *Id.*

      i.    **The Insurance Policy Coverage for "Personal and Advertising Injury Liability"**

Selective first argues its duty to defend was not triggered because High Five's allegations fall outside the terms of the Insurance Policy. (Doc. 46.) H5G disagrees, relying primarily on the Wisconsin Supreme Court's holding in *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 261 Wis. 2d 4 (Wis. 2003) (hereinafter *Fireman's Fund*). (Doc. 47, at 10–13.)

In *Fireman's Fund*, the insured argued that the insurer had a duty to defend because the allegations of "trade secret misappropriation" fell within the coverage provisions of the insurance policy. *Fireman's Fund Ins. Co.*, 261 Wis. 2d at 15. The policy provided coverage for "advertising injury," which it defined as: "misappropriation of advertising ideas or style of doing business; or infringement of

9

trademark, copyright, title, or slogan." *Id.* at 22. In light of this definition, the parties understandably agreed that the policy covered advertising injury arising from trademark infringement. *Id.* But the parties also agreed that injury from trademark infringement included infringement of "service marks, trade names, and trade dress." *Id.* at 23. The Wisconsin Supreme Court held that the complaint's allegations fell within the insurance policy provisions, and therefore the insurer's duty to defend was triggered. *See id.* at 28 ("Based upon the four corners of the complaint liberally construed and drawing reasonable inferences therefrom, . . . the . . . complaint alleges that [the insured] committed an offense covered under the advertising injury provision of the . . . insurance polic[y]."). The court reasoned that the trade secret misappropriation allegations arguably described trade dress infringement—which the parties had agreed was an "advertising injury." *Id.*

The facts, policy provisions, and allegations in *Fireman's Fund* are markedly different than those in this case. Here, the Insurance Policy defines "personal and advertising injury" as "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (Doc 46-3, at 131.) This definition does not include trademark infringement, as did the definition of "advertising injury" in *Fireman's Fund*. Moreover, Selective's Insurance Policy expressly **excludes** from coverage any claims for "personal and advertising injury" arising from "infringement of copyright, patent, trademark, trade secret or other intellectual property rights." (*Id.* at 122-23.) The issue in *Fireman's Fund* was not whether the policy provided coverage for trademark infringement—the policy expressly stated that it did and the parties agreed to that fact. The issue in *Fireman's Fund* was whether the complaint could be construed as stating a claim for trade dress infringement, which the parties agreed was a kind of trademark infringement.

H5G argues essentially the inverse of what the insured argued in *Fireman's Fund*. H5G reasons that, because the Insurance Policy covers "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement,'" (Doc. 46-3, at 122, 131), it should also be construed as covering trademark infringement generally. (Doc. 47, at 10–11.) To advance this argument, H5G attempts to equate slogan infringement with trademark infringement. However, while it is true that a slogan can be trademarked, "[a] slogan is certainly not by definition a trademark." *Cincinnati Ins. Co. v. Zen Design Grp., Ltd.*, 329

10

F.3d 546, 556 (6th Cir. 2003). The Sixth Circuit has defined a slogan as a "distinctive cry, phrase, or motto of any party, group, manufacturer, or person; catchword or catch phrase." *Id.* In other words, a slogan must convey a secondary meaning apart from identifying a product or the product's source. *See id.*; *see also Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616–20 (2d Cir. 2001). The Second Circuit, consistent with the Sixth Circuit's definition of slogan, has distinguished slogans from house marks and product marks. *Hugo Boss Fashions, Inc.*, 252 F.3d at 616 (holding Hugo Boss USA's house mark "BOSS" is not a slogan). The Second Circuit defined slogans "[as] phrases used to *promote* or *advertise* a house mark or a product mark . . . ."[3] *Id.* Moreover, the Second Circuit defined a "house mark" as a company name or line of products, and a "product mark" as a name of a particular product. *Id.* Therefore, according to the Second Circuit:

> It would be odd indeed to say that the trademarked *name* of a brand, product, or company constitutes a "trademarked slogan" merely because it "remind[s] the consumer of the brand." For under this definition, all house, product, or brand names would qualify as slogans. Thus, it seems clear that a "slogan" must be something, *other than the house mark or product mark itself*, that provides such a reminder.

*Id.* at 619 (emphasis in original) (quoting, in part, *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986)).

High Five alleges it owns the High Five Marks for sportswear goods and equipment, which include the marks, "HIGH FIVE," "HIGH 5 SPORTSWEAR," and "High 5." (Doc. 1, at 2, 5.) The High Five Marks, according to High Five, "have come to be recognized and relied on as identifying high quality products originating exclusively from High [Five]." (*Id.* at 5.) These marks are not advertising phrases that promote High Five's products or product lines. They are variations of High Five's company name and brand and do not convey a separate meaning apart from the product's identity or source. Therefore, the High Five Marks are not slogans.

H5G also argues that High Five's claims are tantamount to claims for trade dress infringement or false designation of origin under the Lanham Act. (Doc. 47, at 11–12.) Again, H5G relies on *Fireman's*

---

[3] The Second Circuit provided the following examples of slogans: Nike's slogan is "JUST DO IT"; American Express's slogan is "DON'T LEAVE HOME WITHOUT US." *See Hugo Boss Fashions, Inc.*, 252 F.3d at 620.

11

*Fund* to support its conclusion. (*Id.*) In *Fireman's Fund*, the court held that Lanham Act claims for false designation of origin were covered as trade dress infringement. *Fireman's Fund Ins. Co. of Wis.*, 261 Wis. 2d at 25. The court based this conclusion on the fact that the alleged claims included a claim for misappropriating product "designs." *Id.* The court defined trade dress as "a product's 'total image' and 'refers to the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Id.* at 23. Here, H5G argues that High Five alleges trade dress infringement because it asserts that H5G's use of similar marks is likely to confuse customers about the origin of its products. (Doc. 47, at 11–12.) Treating H5G's alleged trademark infringement as tantamount to trade dress infringement would be error, however, because "trademark and trade dress are two distinct concepts under the Lanham Act." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 547 (6th Cir. 2005).

Addressing the issue of whether trade dress is the equivalent to a trademark, the Sixth Circuit first noted that:

> [T]he Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" which is used or intended to be used by a person "in commerce ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."

*Id.* (citing and quoting 15 U.S.C. § 1127). The Lanham Act does not expressly define trade dress, but the Supreme Court has described trade dress as the "design or packaging of a product." *Id.* (citation omitted). Similar to a slogan, trade dress has a "secondary meaning" that identifies a product with its manufacturer or source. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). Applying these principles, the High Five Marks are not trade dress. The marks constitute neither the "total image" nor the design or packaging of High Five's products. Rather, the High Five Marks are words, names, and symbols intended by High Five to identify and distinguish its goods. The High Five Marks are trademarks, not trade dress.

As the High Five Marks are trademarks—not slogans or trade dress, its claims must be premised on trademark infringement.[4] For Selective's duty to defend to be triggered, these claims must "fall under the terms and conditions of the insurance policy." *Fireman's Fund Ins. Co. of Wis.*, 261 Wis. 2d at 18. Under the plain meaning of the Insurance Policy, neither trademark infringement claim nor cybersquatting claims (the other category of claims that High Five alleges) are a "personal and advertising injury." A conclusion to the contrary would in effect rewrite the Insurance Policy to bind Selective to a risk that it did not contemplate. Therefore, as a matter of law, Selective's duty to defend was not triggered by High Five's alleged claims.

### ii. Insurance Policy Coverage Exclusions

Selective also argues that, even if High Five's claims constitute a "personal and advertising injury," it does not have a duty to defend under four (4) exclusions in the Insurance Policy. (Doc. 46-1, at 15–22.) Selective cites the following exclusions: (1) Knowing Violation Of Rights of Another, (2) Material Published Prior to Policy Period, (3) Infringement of Copyright, Patent, Trademark or Trade Secret, ("Intellectual Property Exclusion") and (4) Unauthorized Use of Another's Name or Product. (*Id.*) H5G contends that none of these exclusions apply to bar coverage. (Doc. 47, at 15–24.)

If it is clear the insurance policy does not cover the alleged claims, the analysis ends. *Am. Family Mut. Ins. Co.*, 268 Wis. 2d at 33. Assuming *arguendo*, however, that there were an initial grant of coverage under the Insurance Policy, the next step is to examine the exclusions to determine if they preclude coverage. *See id*. The first inquiry is whether the exclusion is ambiguous; if it is, it must be narrowly interpreted against the insurer. *W. Wisconsin Water, Inc. v. Quality Beverages of Wisconsin, Inc.*, 305 Wis. 2d 217, 235 (Wis. Ct. App. 2007). Each exclusion is examined separately for ambiguity, but "a court will enforce exclusions that are clear from the face of the policy." *Day v. Allstate Indem. Co.*, 332 Wis. 2d 571, 585 (Wis. 2011). The court also must be mindful that some policy exclusions have their own exceptions; "if a particular exclusion applies, [a court will] then look to see whether any exception to

---

[4] It is unnecessary to determine if "personal and advertising injury" arose from H5G's advertisement or advertising activity because the Court has concluded that trademark infringement and cybersquatting are substantively different from claims for infringement of slogan or trade dress.

that exclusion reinstates coverage." *Am. Family Mut. Ins. Co.*, 268 Wis. 2d at 33. For the reasons set forth below, the Prior Publication Exclusion and Intellectual Property Exclusion are unambiguous and apply without exception to effectively preclude coverage for High Five's claims.

1. **Prior Publication Exclusion**

The Prior Publication Exclusion in the Insurance Policy excludes coverage for personal and advertising injury "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (Doc. 46-3, at 122.) The exclusion is clear on its face; it applies only if H5G published the injurious material at issue before the Insurance Policy's effective date. Selective argues this exclusion applies because H5G "created its alleged infringing website . . . in November 2009 . . . [prior to] the inception of the Selective Policy on June [4], 2015." (Doc. 46-1, at 16–17.) H5G asserts that the Complaint states "no allegation that H5G infringed High Five's trademarks prior to the inception of the policy." (Doc. 47, at 18.)

Contrary to H5G's assertion, the Complaint explicitly alleges "the www.high5gear.com website was created on or about November 5, 2009, which is after the registration date of several of the [High Five Marks]." (Doc. 1, at 5–6.) High Five further alleges H5G "has engaged in bad faith use of the [High Five] Marks by registering and using the high5gear.com domain name . . . ." (*Id.* at 13–14.) Therefore, again assuming High Five's alleged claims constitute a "personal and advertising injury," the Prior Publication Exclusion applies to preclude coverage. As High Five alleges, the claimed injury arose from oral or written publication of material that was published before June 4, 2015, the beginning of the policy period.

2. **Intellectual Property Exclusion**

The Insurance Policy also excludes coverage for personal and advertising injury "arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights." (Doc. 46-3 at 123.) This exclusion includes an exception stating that it "does not apply to infringement, in your 'advertisement', of copyright, trade dress or slogan." (Doc. 46-3, at 123.) Similar to the Prior Publication Exclusion, the Intellectual Property Exclusion is clear from the face of the policy. As concluded above,

High Five alleges claims for trademark infringement and cybersquatting, not infringement of trade dress or slogan. The exception therefore does not reinstate the coverage precluded by the exclusion.

The Court does not address the Knowing Violation Exclusion and Unauthorized Use Exclusion because the above exclusions apply and are adequate to preclude coverage for all of the alleged claims. As there are no genuine issues of material fact concerning Selective's duty to defend, the Court must grant summary judgment for Selective on H5G's claim for breach of the duty to defend.

### C. Duty to Indemnify

Selective argues that, since it does not have a duty to defend, H5G's claim that Selective owes a duty to indemnify H5G also must fail. (Doc. 46-1, at 22.) H5G argues that it would be premature for the Court to rule on this claim because "the issue of whether the insurance company has the duty to indemnify is not ripe unless and until the insured, H5G, is found liable." (Doc. 47, at 24.) Liability insurance contracts typically include both a duty to defend and a duty to indemnify, but they are separate contractual duties. *Johnson Controls, Inc. v. London Mkt.*, 325 Wis. 2d 176, 191 (Wis. 2010). Under the Insurance Policy, Selective is obligated to indemnify H5G for the sums that H5G "becomes legally obligated to pay as damages because of 'personal and advertising injury' to which th[e] insurance applies." As previously concluded, however, the claims alleged in the *High Five* Lawsuit do not fall within the "personal and advertising injury" provisions of the Insurance Policy. Therefore, as a matter of law, Selective has no duty to indemnify H5G because the Insurance Policy does not apply to the alleged claims even if the claims are eventually proven.

### D. Bad Faith Claim

Selective argues that H5G's bad faith claim fails as a matter of law because Selective has no duty to defend or indemnify H5G relating to the *High Five* Lawsuit. (Doc. 46-1 at 23.) H5G argues that summary judgment is inappropriate on this claim because "there has been no discovery up to this point." (Doc. 47 at 25.) Specifically, H5G argues it lacks evidence to prove Selective acted in bad faith when it denied coverage. (*Id.*)

15

"To establish a claim for bad faith, the insured 'must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 377 (Wis. 1995) (citing *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 691 (Wis. 1978)). The insured must establish that, under the facts and circumstances, a reasonable insurer could not have denied the claim. *Id.*

H5G submitted an insurance claim to Selective for the *High Five* Lawsuit. (Doc. 19, at 5.) Selective informed H5G that it was denying the claim because trademark infringement and cybersquatting claims were not covered by the Insurance Policy. (*Id.*) The Court has found, as a matter of law, that Selective was correct—the Insurance Policy does not cover the claims against H5G in the *High Five* Lawsuit. H5G therefore cannot prove the first element of a claim for bad faith—the absence of a reasonable basis for denying the benefits of the policy. Nor has H5G called to the Court's attention any additional facts that might be obtained through discovery that would alter this conclusion. Selective is entitled to summary judgment on this claim as a matter of law.

### E.  Breach of Contract

H5G's claim for breach of contract is based on its claims that Selective has contractual duties to defend and indemnify H5G under the Insurance Policy. (Doc. 19, at ¶¶ 35–38.) As Selective owes neither of these duties to H5G, Selective is entitled to summary judgment on the breach-of-contract claim as well.

### III.  CONCLUSION

Third-Party Defendant Selective Insurance of America's Motion for Summary Judgment (Doc. 46) is **GRANTED**. H5G's First Amended Third-Party Complaint (Doc. 19) is **DISMISSED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, February 21, 2017.

s/ Thomas M. Rose
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE